*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

HOMEOWNERS ASSOCIATION OF
NORTHVILLE COLONY ESTATES
SUBDIVISION 3, 4, AND 5,

       Plaintiff-Appellant,

v

ROBERT SCHURIG and JENNIFER BOLJESIC,

       Defendants-Appellees.

UNPUBLISHED
July 22, 2026
2:35 PM

No. 375262
Wayne Circuit Court
LC No. 23-012881-CH

Before: MALDONADO, P.J., and RIORDAN and YOUNG, JJ.

PER CURIAM.

Plaintiff Homeowners Association of Northville Colony Estates appeals as of right the trial court's order granting summary disposition in favor of defendants Robert Schurig and Jennifer Boljesic pursuant to MCR 2.116(C)(8) and (C)(10).

This case involves an allegedly nonconforming structure built by defendants in their backyard, contrary to the terms of the governing documents of the subdivision requiring plaintiff's approval of such structures before construction to ensure neighborhood "suitability" and "harmony."[1] After proceedings akin to a bench trial, the court held that the structure need not be removed notwithstanding that plaintiff did not approve it. On appeal, plaintiff argues that the trial court erred by ruling that (1) defendants' belated request for plaintiff's approval of the structure after construction of it was complete cured their failure to obtain approval; and (2) the terms of the governing documents requiring plaintiff's approval of such structures are impermissibly vague because the terms do not provide an objective standard for determining when approval is

---

[1] The parties occasionally have referred to the structure by other terms, such as "gazebo" and "project." Unless otherwise appropriate, we generally use the term "structure" throughout our opinion for consistency. We also note that the instant litigation was initiated by the Board of Directors on behalf of plaintiff, but we refer to the Board as "plaintiff" throughout our opinion for ease of discussion.

appropriate. Defendants, as an alternate ground for affirmance, argue that plaintiff lacks standing to maintain this litigation because the governing documents require voter approval of litigation expenses exceeding $750, which plaintiff did not obtain.

For the reasons set forth, we affirm the trial court on the alternate basis argued by defendants.

## I. FACTS

Defendants, as homeowners within the subdivision governed by plaintiff, are subject to certain restrictions set forth in the various governing documents of the subdivision. Two provisions of those documents are relevant to this case. First, Section 15 of the Warranty Deed for the subdivision provides, in relevant part:

**15. Construction of Building, Structure or other Enclosure.**

No building, enclosure or other structure shall be commenced, erected, placed or maintained, nor shall any addition to nor change or alteration to any structure be made. Except interior alterations, until the plan and specifications prepared by a competent architect showing the nature, kind, shape, height and materials, color scheme, location on lots and approximate cost of such structure and the grading plan of the lots to be built upon shall have been submitted to and approved in writing by the Grantor, and a copy of said plans and specifications as finally approved and logged permanently with said Grantor.

A. The Grantor shall have the right to refuse to approve any such plans or specifications or grading plan, which are not suitable or desirable in Grantor's opinion. For aesthetic or other reasons, and in so passing upon such plans, specifications and grading, Grantor shall have the right to take into consideration the suitability of the proposed buildings or other structure to be built to the site upon which it is proposed to erect the same, and the harmony as planned in view of the outlook from the adjacent or neighboring properties. It is understood and agreed that the purpose of this paragraph is to cause the platted lands to develop into a beautiful, harmonious private residence section, and if a disagreement on the points set forth in this paragraph should arise, the decision of the Grantor shall control.

B. However, in the event that the Grantor shall have failed to approve or disapprove such plans and the locations within thirty (30) days after the same shall have been delivered to the Grantor, then such approval will not be required. Provided that the plans and location on the lots conform to and are in harmony with, existing structures in the Subdivision, the provisions of these Restrictions, and any zoning law applicable thereto.

C. Swimming pools are considered structures, as defined under Section 15 hereof. . . .[2]

Second, Article XII, Section 2 of the Bylaws for the subdivision provides as follows:

Expenditures for new equipment, improvements, or other nonoperating expenditures less than Seven Hundred-Fifty dollars ($750) per expenditure shall be approved by a majority of the Board of Directors. Expenditures for new equipment, improvements or other nonoperating expenditures in excess of Seven Hundred-Fifty dollars ($750) shall be approved by a two-thirds majority of votes cast including proxies and/or absentee ballots at either a regular or special meeting. Written notice of the proposed expenditures in excess of Seven Hundred-Fifty dollars ($750) must be given to the members at least fourteen days (14) prior to the date of the meeting. Regular and necessary maintenance is not subject to the above limitations.

According to the complaint, in the summer of 2023, defendants constructed "a large, detached stone walled structure, permanent gas and electric outdoor utilities, fire pit, TV, and gazebo behind their home." (Emphasis omitted.) Plaintiff asserted that its board members first became aware of the project in early June 2023, when the building company left "bricks, dirt, and damage to grass in the common area" during construction. Defendants did not seek approval for the structure beforehand, contrary to Section 15. Instead, defendants belatedly sought approval in late June and early July by submitting various construction plans to plaintiff, after construction of the structure essentially was completed. On or about July 21, 2023, plaintiff informed defendants that it would not approve the structure. However, defendants refused to remove the structure, so plaintiff initiated this case in October 2023, seeking declaratory relief that "Defendants have violated the Restrictions by failing to obtain prior approval for the construction of their patio, gazebo, and walled structure, and by failing to construct the foregoing in a manner acceptable to the Association . . . ."

In January 2025, the parties filed competing motions for summary disposition. Plaintiff, in its motion and brief for summary disposition under MCR 2.116(C)(10), argued that it was entitled to summary disposition because Section 15 requires approval for any exterior "structure," and "the conclusion is unavoidable that the gazebo/pavilion/patio/pergola is a structure." And, because defendants did not have plaintiff's approval for their structure, it follows that the structure violates Section 15. Plaintiff added that its refusal to approve the structure was warranted because

Defendants' gazebo is unique within the neighborhood. There are no other detached gazebo structures in the neighborhood that are permanently affixed with brick columns, that contain a seven-foot-high wall complete with a television and water feature, and a natural-gas fire pit. Simply put, Defendants' structure is materially different in scale and aesthetics from anything else to be found in the

---

[2] While Section 15 of the Warranty Deed refers to the "Grantor" as exercising the relevant power of approval, it is undisputed that under Article II of the Bylaws, all such powers are now exercised by the plaintiff board.

subdivision. It does not fit in. And that alone is a non-frivolous, non-retaliatory reason to deny approval for the project.

Plaintiff observed that its reasons for refusing approval were consistent with Section 15, which requires plaintiff to consider the "suitability" and "harmony" of the proposed structure, as well as "the outlook from the adjacent or neighboring properties." Accordingly, plaintiff sought damages for breach of contract and equitable relief "enjoining Defendants from maintaining the structure . . . ."

Defendants moved for summary disposition under MCR 2.116(C)(8) and (C)(10). In the accompanying brief, defendants argued that they were entitled to summary disposition for the following alternate reasons. First, Section 15 does not apply to gazebos, as demonstrated by the fact that the subdivision includes several other gazebos that apparently were not challenged by plaintiff, and by the fact that an informal e-mail exchange involving current and former board members included the opinion that plaintiff did not have "jurisdiction" over gazebos. Second, plaintiff improperly sought to accord itself, through the use of Section 15, "unfettered power to dictate whatever it chooses without good faith and without notice and consent." Third, under Article XII, Section 2 of the Bylaws, plaintiff was required to obtain a two-thirds majority of homeowner votes to maintain the costs of this lawsuit, which plaintiff failed to do. Thus, defendants argued, dismissal was required under *Tuscany Grove Ass'n v Peraino*, 311 Mich App 389, 391; 875 NW2d 234 (2015), in which this Court held that a condominium association could not maintain the legal action because it failed to obtain approval from a supermajority of co-owners before filing suit, contrary to the association's bylaws. Defendants also asserted that plaintiff acted in bad faith by, for example, waiting until the structure was complete before refusing approval, and by requiring defendants to obtain building permits for the structure despite refusing to grant approval in any event.

Moreover, in a subsequent filing, defendants asserted that Section 15 only applies to "enclosures," or at least that Section 15 does not unambiguously apply to all structures. Thus, defendants argued, any ambiguity in Section 15 should be resolved in favor of the homeowners themselves, and the trial court should therefore conclude that the open-walled structure here is not subject to Section 15.

From the bench, the trial court ruled in favor of defendants at the motion hearing, saying that it "made a site visit," along with both attorneys, the chairperson of the plaintiff board, and defendant Robert Schurig; that it briefly and unsuccessfully attempted to facilitate a resolution; and that it compared the structure at issue with "other items that are in the neighborhood."[3] In this regard, the trial court stated:

---

[3] A trial court is permitted to view a physical location during a bench trial. See MCR 2.507(D) ("On application of either party or on its own initiative, the court sitting as trier of fact without a jury may view property or a place where a material event occurred."). See also *Davis v Chatman*, 292 Mich App 603, 614; 808 NW2d 555 (2011); *Travis v Preston*, 249 Mich App 338, 348-349; 643 NW2d 235 (2002).

-4-

In fact this Court saw a number of structures in the neighborhood, including the gazebo and patio in question here, but there were decks in the neighborhood. As a matter of fact the home in question here, the Schurig home had a deck with railings that was had no issue with that over the years was tore down and put up this particular gazebo and deck area.

There are other gazebos in the neighborhood, fencing. There's large arborvitae. There are playscapes. There are structures in the neighborhood, as well as other nonconforming uses which the parties and I, and the attorneys had an opportunity to talk about basketball nets which are in front of the house which while not structures are nonconforming uses.

The trial court then explained that defendants "clearly had an obligation" under Section 15 to seek approval before beginning construction, which they failed to do. However, defendants eventually did request approval, "in essence curing the issue of prior approval, the Homeowners Association eventually declined to approve it."

Turning to the merits, the trial court ruled that Section 15 was unenforceable because it did not set forth "objective standards" for determining whether a structure is entitled to approval:

But at the end of the day the standard that the Homeowners Association is attempting to have the Defendants comply with, as well as everyone else in the subdivision, is really an eye, a beauty is in the eye of the beholder standard. And what the Court means by that is there's language in this HOA document that talks about harmony, beauty, suitability.

If somebody's got a way in which there's an objective manifestation of an ability to enforce harmony, beauty and suitability, this Court's all ears. But those words are unenforceable, they're unpredictable, they're ungovernable and this Court can't enforce it. And there can't be, there's a reasonableness standard that is presumed in every contract and a beauty in the eye of the beholder standard is something that is unenforceable.

As opposed to a specific instruction in the HOA documents that would talk about, for example, what colors may or may not be permitted. What height, what width, placement in the yard, materials that can be used, bricks, et cetera. Full versus partial enclosures. There whether pillars can be used, stone walkways. There's no objective standards by which this Court, and by extension Homeowners Association can enforce and by which the homeowners can be on notice of what is and what is not permitted.

Structures are permitted, but what are the guiding standards other than whatever particular Board leadership may be in place at any particular time.

The trial court also ruled that plaintiff did not need voter approval for the instant litigation under the Bylaws and reiterated that Section 15 was unenforceable:

The Court will note for the record that the Board didn't need a vote to litigate this matter, that the Board had the authority to litigate this matter. There was no Tuscany Provision in the HOA documents that would prohibit the Board from proceeding on this matter.

But at the end of the day the language in the HOA is unenforceable as vague as without standards and guidelines as to height and materials, uses, et cetera. It's an open invitation to exercise discretion without restraint and at the whim of whatever Board happens to be in place at a particular time.

* * *

The Court will not grant equitable relief unless there is an obvious violation. This Court can't tell itself what is the violation because there is no definition of what structures are or not permitted, and all this Court can do is look to the balance of the neighborhood as to other types of uses similarly situated as being previously approved or at least not challenged.

Two days later, the trial court entered its written order memorializing its opinion from the bench and granting summary disposition in favor of defendants pursuant to MCR 2.116(C)(8) and (C)(10), and denying summary disposition in favor of plaintiff.

Plaintiff now appeals, raising two issues. First, plaintiff argues that the trial court erred by ruling that defendants cured their failure to obtain approval for the structure by requesting approval after construction had been completed. Second, plaintiff argues that the trial court erred by ruling that Section 15 of the Warranty Deed is void and unenforceable because it fails to include sufficient standards for determining whether a structure should be approved. In addition, defendants argue as an alternate basis for affirmance that the trial court erred by ruling that plaintiff did not need two-thirds voter approval to initiate this lawsuit under Article XII, Section 2 of the Bylaws.

## II. STANDARD OF REVIEW

This Court reviews a trial court's ruling on a motion for summary disposition de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). "A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint. All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant." *Id*. at 119. "A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Id*. (quotation marks and citation omitted). "When deciding a motion brought under this section, a court considers only the pleadings." *Id*. at 119-120.

"A motion under MCR 2.116(C)(10), on the other hand, tests the factual sufficiency of a claim." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 160; 934 NW2d 665 (2019) (emphasis omitted). "When considering such a motion, a trial court must consider all evidence submitted by the parties in the light most favorable to the party opposing the motion." *Id*. "A motion under MCR 2.116(C)(10) may only be granted when there is no genuine issue of material fact." *Id*. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted).

"The trial court's interpretation of restrictive covenants presents a question of law that this Court reviews de novo. The interpretation of a contractual agreement also presents a question of law subject to de novo review." *Aldrich v Sugar Springs Prop Owners Ass'n, Inc*, 345 Mich App 181, 186; 4 NW3d 751 (2023) (internal citation omitted).

## III. DISCUSSION

Our Supreme Court has "consistently supported the right of property owners to create and enforce covenants affecting their own property." *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206, 214; 737 NW2d 670 (2007) (cleaned up). "Deed restrictions preserve not only monetary value, but aesthetic characteristics considered to be essential constituents of a family environment." *Id*. (quotation marks and citations omitted).

> If a deed restriction is unambiguous, we will enforce that deed restriction as written unless the restriction contravenes law or public policy, or has been waived by acquiescence to prior violations, because enforcement of such restrictions grants the people of Michigan the freedom [to] freely to arrange their affairs by the formation of contracts to determine the use of land. [*Id*. (quotation marks and citation omitted).][4]

However, "the provisions of a covenant are to be strictly construed against the would-be enforcer and doubts resolved in favor of the free use of property." *Conlin v Upton*, 313 Mich App 243, 256; 881 NW2d 511 (2015) (cleaned up). "When construing a restrictive covenant, courts may only give it a fair construction; courts may not broaden or limit the restriction." *Id*. "To that end, courts will not infer the existence of a restriction—the restriction must be expressly provided in the controlling documents." *Id*.

## A. CURING THE BREACH

Plaintiff first argues that the trial court erred by ruling that defendants cured their failure to obtain approval for the structure by requesting approval after construction had been completed. We agree with plaintiff that such reasoning would have been erroneous, although we do not understand the trial court as engaging in that reasoning.

"Under Michigan law, where one party to a contract commits a material breach, the nonbreaching party is entitled to terminate the contract. The parties may modify this rule by conditioning the right to terminate for a material breach upon notice and the opportunity to cure." *Convergent Group Corp v Kent Co*, 266 F Supp 2d 647, 657-658 (WD Mich, 2003) (internal citation omitted). For example, in the context of the Uniform Commercial Code, subject to various procedural rules, a seller of goods may cure contractual nonperformance. See *Am Bumper Mfg Co*

---

[4] These principles apply not only to deeds but bylaws as well. See *Aldrich*, 345 Mich App at 187-188. "Operating agreements, such as a corporation's bylaws, are intended to govern the future conduct of the entity and its members." *Conlin v Upton*, 313 Mich App 243, 254; 881 NW2d 511 (2015). "When validly promulgated, an entity's bylaws or similar governing instrument will constitute a binding contractual agreement between the entity and its members." *Id*. at 255.

*v Transtechnology Corp*, 252 Mich App 340, 346-347; 652 NW2d 252 (2002). See also *RW Power Partners, LP v Virginia Electric & Power Co*, 899 F Supp 1490, 1496 (ED Va, 1995) (discussing the common-law principle that "the party in breach be allowed a period of time—even if only a short one—to cure the breach if it can") (quotation marks and citation omitted).

Here, Section 15 essentially imposes two relevant requirements—(1) homeowners such as defendants must seek plaintiff's approval of a particular structure before beginning construction, and (2) homeowners such as defendants must actually obtain plaintiff's approval before beginning construction. In its opinion from the bench, the trial court briefly suggested that defendants had cured their failure to comply with both of these requirements merely because they sought approval of the structure after construction was complete:

> However this Court notes, and the record is clear, that the homeowners did in fact when they were notified of this requirement or clearly put on notice that they did in fact apply for approval in essence *curing* the issue of prior approval, the Homeowners Association eventually declined to approve it.
>
> * * *
>
> There is, again, reasonable standard that's assumed in the law if it's not in the grantor's sole opinion. But at the end of the day while the Defendant needed prior approval and didn't, they did *cure* that, better late than never. [Emphasis added.]

We acknowledge that the trial court seemingly implied that the mere fact that defendants sought post-construction approval of the structure cured both the alleged contractual failure to seek approval in the first instance, as well as the alleged contractual failure to have plaintiff's ultimate approval of the structure. We certainly agree with plaintiff that the latter conclusion is illogical, as a mere request for approval cannot "cure" a nonconforming structure itself. However, when the trial court's comments are considered in context and in light of the fact that the trial court clearly understood the history of the dispute, it is apparent that the trial court only was ruling that defendants' belated request for post-construction approval alleviated that aspect of the alleged Section 15 breach pertaining to the request itself. In other words, as the trial court explained, defendants should have sought approval of the structure before beginning construction, as required by Section 15, but defendants' failure to timely do so was, for all practical purposes, essentially a moot point because defendants thereafter sought approval, which triggered plaintiff's review of the structure and eventual judicial involvement in this case. That is, the question of precisely when defendants sought approval of the structure now is irrelevant, as the only remaining issue to decide is whether the structure should be removed because it violates Section 15. We agree with the trial court's reasoning in this regard and find no reason to disturb it. Therefore, relief is not warranted for this issue.

## B. VAGUENESS

Next, plaintiff argues that the trial court erred by ruling that Section 15 of the Warranty Deed is void and unenforceable because it fails to include sufficient standards for determining whether a structure should be granted approval. We agree with plaintiff.

"It is a bedrock principle in our law that a landowner's bundle of rights includes the broad freedom to make legal use of her property." *Thiel v Goyings*, 504 Mich 484, 496; 939 NW2d 152 (2019). "Restrictive covenants are at once in tension with and complementary to this right: deed restrictions allow landowners to preserve the neighborhood's character. And the failure to enforce the deed restriction thus deprives the would-be enforcer of a valuable property right." *Id*. "But enforcing a restriction beyond the restrictor's intent deprives the landowner of an even more fundamental property right—his right to legal use of his own property." *Id*. at 496-497. "The language employed in stating the restriction is to be taken in its ordinary and generally understood or popular sense, and is not to be subjected to technical refinement, nor the words torn from their association and their separate meanings sought in a lexicon." *Steeley v Phi Sigma Delta House Corp*, 245 Mich 252, 253; 222 NW2d 180 (1928).

Contract law recognizes that a party is not entitled to equitable relief for violation of a contractual term unless the term at issue is sufficiently certain:

> By the great weight of authority, equity will not grant specific performance unless the terms of the contract are sufficiently certain for the court to decree with some exactness what the defendant must do.

> Under this standard, it is clear that absolute certainty regarding every aspect of the contract is not required in order that a decree of specific performance be issued; the fact that matters collateral to the primary undertaking or solely concerned with the performance of the contract are not expressed in the contract is no bar to the remedy. Reasonable certainty of terms is all that is required, and whether the terms of the contract are sufficiently certain depends not only on the language of the contract but also on the surrounding circumstances and the overarching intent of the parties, since uncertainty apparent from a literal reading of the contract often disappears upon proper judicial interpretation and construction. . . . [*Williston on Contracts* § 67.4 (4th ed.) (footnotes omitted).]

See also *Thiel*, 504 Mich at 514 (VIVIANO, J., *concurring*) ("Restrictive covenants, to be enforceable in equity, must be reasonable. Further, they must not be vague or uncertain, nor may the right to relief be doubtful; and where a restrictive covenant is being used as a means of annoyance or oppression, equity may cancel it.") (quotation marks and citation omitted).

"Where a party to a contract makes the manner of its performance a matter of its own discretion, the law does not hesitate to imply the proviso that such discretion be exercised honestly and in good faith." *Burkhardt v City Nat'l Bank of Detroit*, 57 Mich App 649, 652; 226 NW2d 678 (1975). However, this implied covenant "neither overrides nor replaces any express contractual term." *Bank of Am, NA v Fidelity Nat'l Title Ins Co*, 316 Mich App 480, 501; 892 NW2d 467 (2016) (quotation marks and citation omitted).

In this case, the pertinent provision of Section 15 of the Warranty Deed is as follows:

> The Grantor shall have the right to refuse to approve any such plans or specifications or grading plan, which are not suitable or desirable in Grantor's opinion. For aesthetic or other reasons, and in so passing upon such plans,

specifications and grading, Grantor shall have the right to take into consideration the suitability of the proposed buildings or other structure to be built to the site upon which it is proposed to erect the same, and the harmony as planned in view of the outlook from the adjacent or neighboring properties. It is understood and agreed that the purpose of this paragraph is to cause the platted lands to develop into a beautiful, harmonious private residence section, and if a disagreement on the points set forth in this paragraph should arise, the decision of the Grantor shall control.

This provision includes sufficient standards governing whether approval of a structure is warranted by plaintiff. The provision refers to "aesthetic" reasons, "suitability" of the proposed structure in relation to the surrounding area, "harmony" from the perspective of nearby homeowners, and an overall "beautiful, harmonious" neighborhood. See *Brown v Martin*, 288 Mich App 727, 731; 794 NW2d 857 (2010) ("Judicial policy requires that we seek to protect property values as well as aesthetic characteristics considered to be essential constituents of a family environment.") (quotation marks and citations omitted). In other words, the structure must be consistent with the nature of the neighborhood, and not so ugly or unusual that it diminishes the quality of the neighborhood. While these considerations are somewhat subjective in the sense that, for example, there are no explicit color or height limitations, reasonable homeowners and condominium co-owners are capable of distinguishing between unsightly structures that diminish neighborhood quality and appropriate structures that maintain neighborhood quality. Indeed, we have upheld and applied similar provisions in previous cases. See, e.g., *Village of Hickory Pointe Homeowners Ass'n v Smyk*, 262 Mich App 512, 514; 686 NW2d 506 (2004) ("In considering such plans and specifications, Developer shall have the right to take into consideration compatibility of the proposed building or other structures with the surroundings and the effect of the building or other structure on the view from adjacent or neighboring properties."); *Hills of Oakland Subdivision Assoc v Seibert*, unpublished per curiam opinion of the Court of Appeals, issued September 25, 2024 (Docket No. 366370), at p 9 ("The Committee may disapprove plans because of . . . any matter or thing, which in the reasonable judgment of the Committee, would render the proposed improvement or alteration inharmonious or out of keeping with the objectives of the Committee or with the improvements erected on other Lots in the Subdivision.").[5] Further, while the provision indicates that plaintiff's decision to grant or deny approval is unilateral and not subject to challenge, the law implies that plaintiff's decision must be rendered honestly and in good faith. See *Burkhardt*, 57 Mich App at 652. Here, nothing in the record shows plaintiff made its decision dishonestly or in bad faith. Thus, the mere fact that Section 15 seemingly allows plaintiff unilateral authority to grant or deny approval for a structure is not a basis for voiding that provision.

---

[5] "Although MCR 7.215(C)(1) provides that unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value." *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017).

For these reasons, we disagree with the trial court that Section 15 is unenforceable on the basis of vagueness.[6]

## C. AUTHORITY TO PURSUE LITIGATION

Finally, as an alternate ground for affirmance, defendants argue that this case must be dismissed because plaintiff did not obtain voter approval for these litigation expenses, contrary to Article XII, Section 2 of the Bylaws, which provides that "[e]xpenditures for new equipment, improvements or other nonoperating expenditures in excess of Seven Hundred-Fifty dollars ($750) shall be approved by a two-thirds majority of votes cast including proxies and/or absentee ballots at either a regular or special meeting." We agree.[7]

In *Tuscany Grove*, the condominium association initiated litigation against a co-owner to compel compliance with a certain fencing-related restriction within the bylaws. *Tuscany Grove*, 311 Mich App at 391. However, the association did not obtain voter approval for the litigation, contrary to the following provision within the bylaws:

> **Limitations on Assessments for Litigation**. The Board of Directors shall not have authority under this Article II, Section 2, or any other provision of these Bylaws or the Master Deed, to levy any assessment, or to incur any expense or legal fees with respect to any litigation, without the prior approval, by affirmative vote, of not less than 66–2/3% of all Co-owners in value and in number. This section shall not apply to any litigation commenced by the Association to enforce collection of delinquent assessments pursuant to Article II, Section 6 of these Bylaws. In no event shall the Developer be liable for, nor shall any Unit owned by the Developer be subject to any lien for, any assessment levied to fund the cost of asserting any claim against Developer whether by arbitration, judicial proceeding, or otherwise. [*Id*. at 393-394 (emphasis omitted).]

This Court affirmed the trial court's dismissal of the case because "the effect of this provision is to prevent the board of directors from filing suit without supermajority approval." *Id*. at 394. As a result of the failure to obtain supermajority voter approval, the association "lacked the authority to file suit." *Id*.

---

[6] Defendants argue that Section 15 is either limited to enclosures or, at a minimum, is ambiguous in that regard, and the ambiguity should be resolved in their favor. Defendants observe that the title of Section 15 is "Construction of Building, Structure, or other Enclosure," which suggests that the terms "building" and "structure" are limited in scope to "enclosure[s]." We disagree. Section 15 repeatedly refers to "structure[s]" as the target of its regulations, indicating that the intended scope of Section 15 is all outdoor structures. While we acknowledge that the title suggests otherwise, when Section 15 is read as a whole and understood reasonably, it may apply to the gazebo/structure project here.

[7] It is undisputed that the costs of the instant litigation exceed $750 and that plaintiff did not specifically obtain voter approval for them.

Here, in the matter before us, once again, Article XII, Section 2 of the Bylaws provides as follows:

> Expenditures for new equipment, improvements, or other nonoperating expenditures less than Seven Hundred-Fifty dollars ($750) per expenditure shall be approved by a majority of the Board of Directors. Expenditures for new equipment, improvements or *other nonoperating expenditures* in excess of Seven Hundred-Fifty dollars ($750) shall be approved by a two-thirds majority of votes cast including proxies and/or absentee ballots at either a regular or special meeting. Written notice of the proposed expenditures in excess of Seven Hundred-Fifty dollars ($750) must be given to the members at least fourteen days (14) prior to the date of the meeting. Regular and necessary maintenance is not subject to the above limitations. [Emphasis added.]

We agree with defendants that the term "other nonoperating expenditures" encompasses costs of the instant litigation. The generally recognized difference between operating expenses and nonoperating expenses is whether the expense at issue is ordinary and recurring. See *O'Neal v JLH Enterprises, Inc*, 862 So2d 1021, 1028 (La Ct App, 2003); *Pullman Co v Great Northern R Co*, 514 F2d 325, 331 (CA 7, 1975). See also *Detroit Pub Sch Community Dist v Dep't of Treasury*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 379565); slip op at 8-9 ("Considered in context, the term 'school operating purposes' generally is limited to those day-to-day expenses necessary for the operation and maintenance of schools themselves, such as furniture and textbook purchases, teacher salaries, water-fountain installations, and so forth . . . ."). Indeed, the provision of the Bylaws at issue indicates that "new equipment" and "improvements," which are unusual and non-recurring, are subject to the voter-approval requirement, while "[r]egular and necessary maintenance" is not subject to the voter-approval requirement.

An expense for litigation such as the instant case is not an ordinary and recurring operating expenditure. Rather, it is a non-recurring "nonoperating expenditure" of plaintiff. Therefore, it is subject to the voter-approval requirement of Article XII, Section 2 of the Bylaws. Because plaintiff did not obtain that approval, this case must be dismissed because plaintiff lacks the authority to maintain this litigation. See *Tuscany Grove*, 311 Mich App at 394.[8]

We recognize that the president of the plaintiff board testified during his deposition that "when it comes to legal services, in November, a budget is proposed to the membership for a vote, in which case legal services are a operating expenditure."[9] Therefore, the record before us suggests

---

[8] We acknowledge that the *Tuscany Grove* provision expressly stated that "[t]he Board of Directors shall not have authority" to initiate litigation without voter approval, whereas the provision here is silent on the plaintiff board's authority. However, the clear implication of the provision here is that the plaintiff board lacks the authority to incur and appropriate funds when it fails to obtain required voter approval.

[9] Further, plaintiff represents in its reply brief that "[y]ear after year, legal fees and expenses have been classified as budgeted operating expenses in Plaintiff's professionally prepared tax filings and Plaintiff's annual budgets have been approved by the membership."

-12-

that the parties to the Bylaws have treated at least some legal services as an "operating expenditure" that is not subject to the specific voter-approval requirement. See generally, *Detroit Greyhound Employees Fed Credit Union v Aetna Life Ins Co*, 381 Mich 683, 686; 167 NW2d 274 (1969) ("In cases where the language used by the parties to the contract is indefinite or ambiguous, and hence of doubtful construction, the practical interpretation of the parties themselves is entitled to great, if not controlling, influence.") (quotation marks and citation omitted). We do not suggest that plaintiff is required to obtain voter approval for all legal services, even those that are regular and recurring.[10] Rather, our opinion is limited to those unusual "nonoperating expenditures," such as the instant litigation, that cannot be expected to recur, nor recur, on a regular basis.

## IV. CONCLUSION

Article XII, Section 2 of the Bylaws prohibits the instant litigation because plaintiff did not obtain voter approval for its cost. Therefore, we affirm the trial court's dismissal of this case.[11]

/s/ Allie Greenleaf Maldonado
/s/ Michael J. Riordan
/s/ Adrienne N. Young

---

[10] For example, legal services that plaintiff may require each tax season would not be subject to voter approval. Moreover, litigation for other matters such as the collection of delinquent assessments arguably is not subject to voter approval, as that litigation reasonably may be expected to recur.

[11] While the trial court did not rely on this reasoning, "[a] trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason." *Gleason v Mich Dep't of Trans*, 256 Mich App 1, 3; 662 NW2d 822 (2003).